The calendar is United States of America v. Hannibal Moore. I'm here as counsel for Mr. Hannibal Moore. I'd like to discuss three things in particular, the first being the Rule 609 issue in the case, the second, the impact of the 404 bill or collateral evidence, and third, the mechanism of the new trial motion, judgment of acquittal motion and how it was decided in the court below. The 609 issue comes down to this, the court, the trial court ruled that in the absence of 11th Circuit precedent as to whether a period of probation is confinement under the rule. That dictates how we look at the 10-year look back under that rule. In this case, Mr. Moore had two convictions. Well, there's three convictions. One, we don't dispute. That's the 2020 conviction of the Northern District for the 922G case. The other two were a robbery that he was convicted in 2005, and the second was a giving false information case in which he was convicted in 2006. And we file a motion in limine to keep those convictions from being used to impeach him with the anticipation that he would take the stand as a witness because of his defense of justification. In discussing that with the trial court, our rationale was he received a 20-year split, five-year to serve sentence on the robbery, and he would have been released from confinement March 21st of 2010, which would be beyond the 10-year look back. The trial was in December of 2020. The government argued that his period of five-year probation should be included in that period of confinement to bring it within the 10-year period. The giving false information is a little more difficult to analyze because it was a count two of a two-count case with the second count being receiving stolen property. The government did not use that for impeachment, the receiving stolen property, which was the felony count, but instead used the giving false information, which is a misdemeanor count, but which involved an issue of truthfulness under 609A2. Let me ask you this just to cut to the chase a little bit. So, let's say I agree with your understanding of confinement in that it does not include probation. We've got, I think we've got the one conviction for, he was impeached with three convictions, right? He was impeached with being a felon in possession previously, and there's no question that comes in, right? The confinement issue doesn't have anything to do with that. So, then the other was the false information and then burglary, right, or the robbery are the two that are involved in the confinement issue. Because the defendant testified, the court had to evaluate whether the probative value of this outweighed the prejudice of it under the rule that the court used, 609A. 609B just says that it has to substantially outweigh. So, if you were to win this confinement issue, then the analysis would be substantially outweighs. You know, given the first offense comes in, how can we say that using the sort of the wrong analysis on this is prejudicial? And I take the question as really being one of why isn't this harmless error? Yeah. Well, and here's why. He was charged in this case with a 922G. So, the jury in this case would be well aware of what it takes to be convicted of 922G, which is not much. It doesn't carry connotations of particularly bad behavior, violent behavior, or untruthfulness. Robbery and giving false information does. And so, our position is it's prejudicial and not harmless because of the nature of the robbery. Yeah, but I guess, and so maybe I'm thinking about the prejudice just in a slightly different way and maybe I'm thinking about it wrong. But the prejudice to me isn't whether they come in or not. The prejudice to me is that the district court did the analysis under 609B, right? Correct. Okay, so... Counsel, let me correct you on that. The district court did that during the trial, but in ruling on the motion for new trial after the trial was over, the district court said, I would have allowed the cross-examination without the prior convictions, even if the higher standard was 609B-1. So, you've got an alternative ruling. Yes. And the district court did consider and did rule on whether there had been a showing that the benefit substantially outweighed the prejudice and did squarely confront and rule on that issue. I agree that the court did rule on that issue in the order on the ruling.         Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. And using, your Honor, using that analysis, I think the court was incorrect in its ruling because I think the probity of those two offenses, robbery and giving false information, given the fact that they were, one was nearly 20 years old, the other 19, 18 years old, very far, temporarily, not close together, not related by the particular elements, robbery and giving false information, not akin to the 922G charge. Yeah, but isn't the false information, I mean, you mentioned this earlier, I mean, isn't the false information, when someone's testifying, the fact that they've previously given false information, I mean, it has a higher relevancy than just being related to the charge? I think it would have a higher relevancy than the robbery charge. I think given the age of the conviction, I think that that would put it in a situation where it's not substantially outweighing the prejudice, the probity of it. I'm not saying it doesn't have any probity, but I think it's very slight in this case. But how can it be slight if your client is getting on the stand and one of the issues is, is he going to be credible and give accurate information, not false testimony? You don't think it's relevant that he's been charged and convicted of giving false information before? I would not say that it's irrelevant. I think it is relevant. I think it does have some probity. Then how would the district court then abuse his discretion in allowing that evidentiary ruling? Because I think the prejudice in this case, when compared to that probative value, the probative value doesn't substantially outweigh that prejudice. But Counselor, you haven't addressed, you're not addressing the overwhelming evidence in the case, which is a factor we have to take into consideration when we're determining the prejudice in England. There was an overwhelming evidence in this case. I mean, most of the case is undisputed. I agree. I think it's a very unusual case because of the justification defense. Rarely are those instructions given. There's not very many cases that I've seen where that defense was actually allowed to go to the jury. But I think in this case, it was proper. Let's approach it this way. What factual statement did Moore make that the jury might have found he was telling the truth about but for this evidence of expired convictions? It was admitted only for a thesis. There were instructions there. A particular statement that he made in his testimony. If the district court erroneously admits impeachment evidence and you're trying to weigh whether or not it was prejudicial or not, you look to whether there's any statement the defendant made that there's a substantial showing that it would have affected the result of the trial, let's say, on that issue. So, what did the defendant testify to that the jury might have been debating whether he was telling the truth or not and then substantially influenced or affected in terms of the arbitrary statute? That is prior conviction. I would point to this. During the trial, there were body cam videos that were introduced. He is seen on those body cam videos talking with the police and explaining to them what happened. His story is consistent in those videos with his testimony. But I think by allowing the impeachment for giving false information to a law enforcement officer, it undercuts an argument that those statements on the video were consistent and support his testimony on the stand. So, I think to that degree, it does cause him prejudice. Thank you. You have time to stay for rebuttal. Mr. Gray. Thank you, Your Honor. May it please the court. Scott Gray on behalf of the United States of America. Hannibal Moore received a fair trial, so he isn't entitled to a do-over. This court should affirm his conviction and his sentence. I'll turn to where the court turned and to where Mr. Moore turned, which is the Rule 609B issue, because that is the closest legal question in the case. As Judge Brasher gets, I think, to the heart of the matter, it's a legal question the court need not and ought not decide here because any error is harmless. And there are really two routes the court can take to get to harmless error. The first path is to look at the admissibility of the evidence, the two questions that were asked here under a Rule 609B standard. As Judge Carnes pointed out, the district court in its post-trial ruling, that's docket it would have allowed these questions under the Rule 609B standard precisely because Moore testified and placed his credibility at issue. The Pritchard case from this court, which Moore cites in his brief, explains that when a defendant or a witness places his or her credibility at issue, and that's a central feature in the case, that is precisely the type of circumstance when these questions, when these sorts of questions can be asked. Therefore, the district court would not have abused its discretion had it ruled on the 609B basis that these questions were admissible. Indeed, the court exercised a significant amount of discretion and restraint in terms of the questions the prosecutor ultimately asked. These questions were not highlighted. And critically, this was never a propensity case. The United States never asserted in the district court that because Moore had these prior convictions, he therefore possessed the firearm on this occasion. It was a much different argument. And the limited presentation here was focused on the impeachment value of those. So that's route number one. Route number two, the alternative, is that even if the court assumes for a moment that those two questions were improper, then those two questions simply did not affect the jury verdict in this case. And therefore, those two questions would be harmless. For starters, the jury, as Moore acknowledges, was allowed to hear about his prior 922G conviction, his more recent conviction. And in addition, the prosecutor ably impeached Moore's testimony on numerous bases. Indeed, the jury heard the clips of Moore's statements to law enforcement and the jury heard dozens of pages of testimony from Moore himself. And the jury readily could find that Moore was an untrustworthy witness. He did not answer the prosecutor's questions directly. He engaged in various forms of almost testimonial whiplash of telling one story and then pivoting to something else. I think there's a good example of that in the trial record. It's document number 98, pages 110 to 112, where he attempts to excuse some of his statements to law enforcement as a product of his inebriation. But then about two pages later in the transcript says that he had a drink, maybe two, and that that didn't affect his judgment. Indeed, the jury saw the videos and Moore himself described his statements in the videos at times as rambling, in which he speculated that he might have hallucinated the shooting and talked about the different numbers of shots that had been fired, whether a shooting had occurred at all, whether his girlfriend shot the victim, or whether he did so. Can I ask you a question about that? Sure. Just to try to pin down, so his justification defense is, you know, these men were coming to my house, or coming to my girlfriend's house where I was. They told me that there was going to be a confrontation. They left. They came back. They were breaking in the door. You know, I grabbed my girlfriend's gun and fired. What evidence is there for that sort of story apart from his testimony, if any? Well, I think, Your Honor— There was some, right? Pardon? There was some evidence for that, right? So, yes. So, there are a couple of different sources of testimony. There's the girlfriend who was present at the time, or the then-girlfriend, I should say, who was present at the time of the shooting and describes the events. I think the difference, Judge Brasher, is that he ultimately testified, he being Moore, that he didn't know who was coming in. Now, the United States theory of the prosecution, as I understand it, was that Moore did know who was going to come back and that, essentially, the shooting was out of revenge and various other factors. But his testimony, as I recollected, was that he ultimately did not know who was going to  Okay. So, the point—I mean, I think, just to make myself understand this, the point of contention between the United States and the defendant was not so much the chain of events but the subjective knowledge and intent of the defendant when he shot the gun. So, I think that's a very good way of putting it. I think it's a little bit broader than that because it really breaks into the four elements of the justification defense, which are a little bit broader than just a traditional mens rea analysis. But it was essentially inviting the jury to understand the story. And if I could make a point sort of to distinguish an issue in the briefing, Moore really frames this issue, as I read it, as the availability of a justification or duress defense. And that's not really what this appeal is about. This appeal is about whether the jury could find on these facts that the defense did not apply to him. The jury received an instruction on the defense. The jury heard the evidence on that defense. It heard evidence from Moore himself. It heard the video statements to law enforcement officers. It heard the testimony from multiple other witnesses about it. The central question here is whether the jury could hear that evidence and then find that it did not apply. And working through those elements, there was absolutely no miscarriage of justice in this case. The very first one is essentially an imminence requirement, that there has to be a threat of harm. And Moore testified that he believed he faced an imminent risk of death or serious bodily harm. But there was contrary evidence in the record. And that came from multiple sources. There was testimony, for example, from Moore that someone was breaking down this door, I thought my reading of the record, and maybe I'm misreading it because there were two times, that the second time, they were trying to get in, they were knocking at the front, and then the brother went to the back door and used the key to get in. I don't know that he's the brother, but yes, the other family member goes to the back. The brother of the ex-boyfriend or whatever it was. Exactly. So, yes, Your Honor, he's coming through. And Moore testifies that essentially this person is breaking down that door. But there's testimony, number one, that he had a key and the law enforcement officer saw no sign of forced entry. Critically, the girlfriend who was present in the home, while she testified that she she also indicated that she saw no need to get a firearm. Indeed, she only got the firearm once Moore essentially, her testimony was, blocked her into the room and would not let her leave until she got it. That's strong evidence that she didn't perceive that level of threat, the level of threat that Moore did. Critically, that's also the most important off-ramp that Moore could have pursued in this case. There's a lot of discussion in the briefing about essentially the time point that applies here. And to be clear, the United States' position is that the jury can and ought consider the entire story of a crime from its beginning to its end. But even if the court adopted a very narrow consideration and looked only at the moment during the second visit, ultimately, Moore was not alone in this home. He was present in his girlfriend's house with his girlfriend's gun, with essentially his girlfriend's family members coming to the home, and she indicated that she was willing to resolve this situation herself. And he deprived her of the ability to do that. That is the most critical off-ramp that Moore could have taken. And critically, that is one of the factors of the justification analysis, namely that the defendant both didn't place himself in that situation but that he didn't have other readily available alternatives at his disposal for a different outcome. Indeed, the defense of justification, as this court has recognized, is an extraordinary defense. And if the court were to distill those elements to the essence, I think they mean essentially that a defendant should have the cleanest of clean hands at the time someone who is prohibited from possessing a firearm, such as a felon, possesses that firearm and then ultimately uses it in an act of purported self-defense. Hannibal Moore's hands were anything but clean in these circumstances, and the jury rightly saw through those arguments. And for that reason, the jury's verdict was not against the great weight of the evidence. Indeed, the facts in the situation are not really as hard or as difficult as the ones in Deleveaux, where the court ultimately looked at the defense. And I point out Deleveaux here because I think the fact pattern in that case is somewhat instructive about the types of messy situations where this defense typically applies. But ultimately, this is a case where the jury's verdict was not against the great weight of the evidence. It was not a miscarriage of justice. Just to follow up, so what are the other elements of the defense, the justification defense? I guess I'm looking for a dispute of fact about what happened. You said the jury could sort of understand the eminence differently, and that's on the first element. But on the second element, I don't think the government has any suggestion that he negligently or recklessly placed himself in this situation, right? So that is the time framing issue. The United States argument is that he did negligently or recklessly place himself in this situation. There was essentially an arc of evidence that began when he assaulted the victim, his girlfriend in Birmingham earlier in that weekend. And then she came back to Mobile, and he came back behind her. And then there was a first visit where the girlfriend's ex-husband came by the residence and attempted to convince him to leave. And so part of the United States argument was that he did place himself in this position because he went back to the home after assaulting her, did not leave when family members showed up. So are you kind of suggesting that you have, like, a duty to retreat from your own— because that's where he lived. I mean, he lived with the girlfriend. So, I mean, that just seems kind of odd to me that he would have, like, a duty to retreat from his own residence because people were coming to beat him up. I think two—one is that it's not— Not that he's a great guy. He's not a great guy. I give you that. And I thought they had changed the locks so he wouldn't be able to come back in. Wasn't that one of the issues?  And then she ultimately, when he returned, decided to let him stay. I think it's— But the change of locks was because she had kicked him out. Correct. Correct. And I would— But then she invited him back, right? Who knows why these people do the things they do? It was aptly described as a messy situation. I would make two responses. One is that it's—you can stop short of saying that there's some sort of a duty of retreat. There were many intermediate steps at his disposal, including calling 911 at that point to essentially resolve the situation and deal with the situation as it was enveloping. The second point I would make is that when we look at it, it's important to be mindful of the standard. We're ultimately not conducting a de novo review of the evidence. When you're looking at a new trial, it's ultimately looking at the inferences the jury could have drawn and whether those inferences are reasonable in yielding a verdict. And then I suppose the third point I would make to simply close the loop on the analysis is that even if the court were to disagree with that point, that's merely one of the four elements. So there is the eminence element, and then there are the off-ramps that we're available at. And again, he was allowed to present the justification defense because normally the appeal is that the district court judge excluded the justification defense. That's exactly right, Your Honor. By my count, there were three out-of-circuit cases that Moore presented, Paolello from the Third Circuit, Paul from the Second Circuit, and Clark from the Sixth Circuit. And I read each of those three cases to be dealing with the defendant's denial of the instruction altogether. And the court ultimately was saying in each of those three cases, this should have gone to the jury. And so when, for example, Moore cites to those cases, it's looking at that from the defendant's view of the evidence to say, the defendant did just enough to make a sufficient threshold showing in order to present the defense. Here, that's not at issue. This went to the jury. The jury had the opportunity to assess and view the evidence, and it ultimately rendered a verdict that didn't go Moore's way. That verdict was not a miscarriage of justice, and therefore, this court should affirm. And unless there are any further questions, I thank the court for its time. Thank you, Mr. Gray. Thank you. I think the court's hit on one thing that's very important, that there really was no dispute as to the basic facts of what happened. I would correct two things. Jerry Coxwell was the ex-brother-in-law, and he was shot not in the doorway, but he had actually entered into the house. It's 1 o'clock in the morning. The house is dark. He was 10 feet or so into the kitchen and coming into the room where Mr. Moore and Ms. Howell were located. So, being no disputed fact, I think it does come down to how do we define the time point that we need to look at to see if this justification defense works or not. And what the government has done is expanded that time point out to include some things that happened earlier in the weekend. We don't think that that's appropriate because the cases where the justification defense were disallowed typically involve a defendant trying to expand that time point out to say, you know, that earlier in the week somebody threatened me, so I got a gun, and then this event happened. And this court has routinely rejected that and said, you know, we are looking at a very narrow slice of time. To be justified, you have to have all of these elements come together at the very moment that you possess the gun and use it. It can't go that far back, and it can't go that far forward. So, we are looking at a very narrow time point. But that would maybe make sense if these were strangers who were coming in through the door. But here the purpose, I guess, of telling the full story to the jury is that the girlfriend, they had had a fight. She had kicked him out. The locks had been changed by the ex-brother-in-law or the husband. And at some point in time, Mr. Moore showed up at the apartment. And I just don't remember the record if why the ex-husband showed up if she called him. But somehow they knew to come to the apartment to see if Mr. Moore would leave. They could get him to leave. Correct. So, that's all part of the justification as to why these people came back. I would respectfully disagree because of this. What happened earlier in the week, the motivations of Andrew Howell or Jerry Coxwell, what their intent was or what they knew is not a relevant or material consideration either to the 922 charge or to the justification defense. It doesn't matter why they were there. It doesn't matter what their motivations were. What matters is what Mr. Hannibal Moore thought at that moment when the events occurred. Their motivation just doesn't come into play. The government argues that it does and that it's all inextricably intertwined because you have to know the whole story. But truthfully, you don't because we're only looking at that very small part of time, that night, probably a few minutes, five minutes at the most. Because if it strays from that, then we don't get the justification defense if we're relying on something outside of that point in time. What about the council for the government talked about the testimony that the girlfriend gave that she was not in fear when someone was trying to enter the second time? Well, my answer to that would be that in looking at the justification defense, her subjective point of view isn't really relevant to the inquiry because the person we're looking at is Hannibal Moore. Well, it's relevant in the sense that she's also there experiencing the same thing that he's experiencing, right? I mean, you keep saying this. I guess here's my issue with this is that if it does turn on the subjective intent of Hannibal Moore, well, he's the only one who can testify about that and he did testify and the jury just didn't believe him, right? I mean, that would be the analysis there. Well, it's not necessarily his subjective intent. Is his belief reasonable, objectively reasonable? She testified that he was panicked, that he was scared. He did that on several occasions. The other circumstances of how it happened suggest that he would be scared. I mean, the brother-in-law wasn't coming to beat up the girl. He was coming to beat up the guy, right? I mean, you have an intruder at 1 o'clock in the morning in a home where you're legally there. So I think all of the undisputed facts suggest that his belief was sufficient. Let me ask you this. So the jury came back with this question about constructive possession. Was it undisputed that this gun was the girl's gun and not the guy's gun? That was undisputed. Okay. That was undisputed. I think what the government did in the case by inviting the jury to look at the motivations of Andrew Howell and Mr. Coxwell, it introduced an artificial element into that justification defense analysis and allowed them to conclude that if Mr. Howell and Mr. Coxwell were justified in coming over that evening, that that would negate the justification defense, and that is not what the law is. Is that what they were instructed? They were not instructed. That was not the jury instruction, correct? Correct. Are we not to presume that the jury follows the instructions that they are given? We are to presume that they follow the instructions. All right. Thank you, counsel. Thank you both for your argument. No, after this one.